**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDUARDO JUAREZ                          :
                                        :
              Plaintiff                 :
                                        :     Case No. 02-4739
        v.                              :
                                        :
CERIDIAN LIFEWORK SERVICES              :
                                        :
CERIDIAN CORPORATION                    :
                                        :
              Defendants                :

## ORDER

      **AND NOW**, on this _____ day of _____, 2003, upon

consideration of Defendant Ceridian Corporation's Motion for Summary Judgment, and any

response thereto, **IT IS HEREBY ORDERED** that the Motion is **GRANTED**, and that

Summary Judgment is entered in favor of Defendant Ceridian Corporation, identified both as

Ceridian Corporation and Ceridian Lifework Services, and against Plaintiff on all of Plaintiff's

claims.

                                     BY THE COURT

                                     _____
                                                 J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EDUARDO JUAREZ | : |
| | : |
| Plaintiff | : |
| | :    Case No. 02-4739 |
| v. | : |
| | : |
| CERIDIAN LIFEWORK SERVICES | : |
| | : |
| CERIDIAN CORPORATION | : |
| | : |
| Defendants | : |

**<u>DEFENDANT CERIDIAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT</u>**

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Ceridian Corporation, incorrectly identified in the Complaint as both Ceridian Corporation and Ceridian Lifework Services, by and through its undersigned counsel, hereby moves this Court for summary judgment on Plaintiff Eduardo Juarez's Complaint.  Defendant respectfully requests that the Court enter judgment in its favor as set forth in the proposed form of Order because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.  The factual and legal grounds for the relief requested are set forth in the accompanying Memorandum of Law and exhibits thereto, which Defendant incorporates herein by reference as if set forth in full.

Respectfully submitted,

_____

Carolyn P. Short
Identification No. 38199
Sara A. Begley
Identification No. 49120
Erin M. O'Neill
Identification No. 82372
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Attorneys for Defendant,
Ceridian Corporation, identified in the
Complaint as Ceridian Corporation and Ceridian
Lifework Services

Dated: June 25, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDUARDO JUAREZ | : | |
| | : | |
| Plaintiff | : | |
| | : | Case No. 02-4739 |
| v. | : | |
| | : | |
| CERIDIAN LIFEWORK SERVICES | : | |
| | : | |
| CERIDIAN CORPORATION | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**CERIDIAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Ceridian Corporation ("Ceridian"), incorrectly identified in the Complaint as both Ceridian Corporation and Ceridian Lifework Services, hereby submits its Memorandum of Law in Support of its Motion for Summary Judgment.

## I.     INTRODUCTION

Plaintiff Eduardo Juarez ("Mr. Juarez") alleges that Ceridian discriminated against him in violation of both the Americans with Disabilities Act ("ADA"), as amended and codified at 42 U.S.C. §§ 12102, 12111, and 12112, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955, by: (1) allegedly terminating his temporary placement at Ceridian as a Consultant and/or failing to hire him for a Consultant position at Ceridian on the basis of his disability; and (2) failing to afford him a reasonable accommodation.  A copy of the Complaint is attached hereto as Exhibit "A".

Ceridian is entitled to summary judgment on all of Mr. Juarez's claims. First, Mr. Juarez is unable to make out a prima facie case of disability discrimination because he was not a "qualified individual" insofar as it is undisputed that he did not possess the requisite typing skills requirement for the position nor could he perform the essential typing function of the job. Second, Ceridian had no obligation to engage in the interactive process of determining an appropriate and feasible accommodation for Mr. Juarez, if necessary, because it is undisputed that Mr. Juarez never requested any accommodation.

## II.    STATEMENT OF UNDISPUTED FACTS

Through a referral from McCallion Staffing Agency ("McCallion"), Mr. Juarez began work for Ceridian as a temporary employee on or about August 6, 2001. Complaint ¶ 11, Answer ¶ 11. A copy of Ceridian's Answer to Plaintiff's Complaint is attached hereto as Exhibit "B". Mr. Juarez's position was as a OneSource Consultant for LifeWorks ("Consultant"). Mr. Juarez's temporary employment was discontinued effective two weeks later, on or about August 17, 2001. Answer, ¶ 20. Mr. Juarez's temporary employment was discontinued because he did not meet the basic requirements for the temporary job. Answer, ¶ 20. Specifically, Mr. Juarez failed to meet the typing requirements for the position. Answer, ¶ 17. Descriptions of Ceridian's business; the requirements for the Consultant position; and the facts surrounding Mr. Juarez's placement at Ceridian and the discontinuation of his temporary placement, are set forth more fully below.

**A.     Ceridian Operates Call Centers To Provide Assistance To Its Customers' Employees.**

Ceridian Corporation's primary business is providing human resource outsourcing

services to other companies.  Answer, ¶ 5.  Ceridian Lifework Services is a division of Ceridian

Corporation, and part of its operations include operating Call Centers to provide assistance to

customers' employees, including a Call Center located in Plymouth Meeting, Pennsylvania.

Answer, ¶ 4.  Ceridian is paid a fee by its customers, which includes companies across the

country, to have services available to those customers' employees.  The services involve

providing assistance over the telephone to the customer's employees with regard to any type of

life circumstance with which the employee might need some help, including mental health

issues.  A copy of the deposition transcript of Sally Mazzola ("Ms. Mazzola"), Ceridian's

Human Resources Consultant, is attached hereto as Exhibit "C" ("Mazzola Dep. Tr."),  Mazzola

Dep. Tr. 19:8-23.

**B.     The Consultant Position Requires The Ability To Type Proficiently, Specifically 40 Words Per Minute.**

The primary purpose of the Consultant position is to provide a telephonic

assessment, consultation, and identification of resources and referrals to users of the service who

initiate contact by telephone, e-mail or fax, and have defined worklife issues.  Answer, ¶ 14.  Ms.

Mazzola described the Consultant position as follows:

> The [C]onsultants within Ceridian take incoming calls from individuals
> who are employees of our client companies.… [I]n the industry it's called
> worklife services and EAP services, which is employee assistance
> programs.  [A]s these calls come in, they could range from different
> topics, such as "I'm going on a week's vacation and need someone to sit

for my dog" to "My mother lives in Texas and she's just had as stroke and I need to be there for her, but when I get there I want to have the appropriate help lined up so that I can interview them." So, [Consultants] provide solutions to help people with issues to keep them at work as much as they can, but to give them the information that they need to settle their issues quickly. There's a broad range of issues that come in and some mandated substance abuse type of calls. So, it's kind of a HR solutions….The calls can really vary.

Mazzola Dep. Tr. 17:21-24, 18:2-19.

One of the job descriptions set forth by Ceridian for the Consultant position, prior to Mr. Juarez's placement, described the "Knowledge, Skills and Abilities" needed to perform the Consultant job as follows:

- A bachelor or master's degree in a related discipline, such as education, social work, counseling psychology or gerontology.

- Knowledge and experience in core services areas of child development, parenting, adoption, education and services for older adults.

- Knowledge of mandated procedures for childcare and elder abuse situations.

- Ability and interest to learn new areas of product portfolio and add-on products.

- Excellent communication skills. Team player.

- Basic customer service, business skills and technical skills. Ability to multi-task and work in a fast paced, high change environment.

- Creative and flexible.

A copy of the "position description" for the Consultant position, which is attached to the deposition transcript of Ms. Mazzola as Exhibit No. 1, is attached hereto as Exhibit "D"

(emphasis added), Mazzola Dep. Tr. 31:23-32:24.  That position description also described the "Working Conditions," in part, as follows:  "<u>The majority of the work involves service delivery via the telephone with case processing on the computer</u>."  Exhibit "D" (emphasis added).  It further specified that: "<u>The environment tends to be fast-paced and technical with much attention to detail.</u>"  Exhibit "D" (emphasis added).

Further, a job posting for the Consultant job, which was created by Ceridian and posted on Ceridian's web-site in 2001 prior to Mr. Juarez's placement, described the "Qualifications" for the position as including:  "<u>Excellent communication and computer/technical skills;</u>" and the "<u>Ability to multi-task and work in fast-paced, high change environment.</u>**"**  A copy of this job posting, which is attached to the deposition transcript of Ms. Mazzola as Exhibit No. 2, is attached hereto as Exhibit "E" (emphasis added), Mazzola Dep. Tr. 33:11-36:1.

The Consultant position does not involve any "face-to-face counseling," but rather, the "whole job is on the computer."  Mazzola Dep. Tr. 23:17-18; 36:12-17.  As such, the position is described to applicants as "50 percent clinical and 50 percent technical."  The deposition transcript of Pat Sergio ("Ms. Sergio"), a Senior Manager Service Delivery in the Consultation Area for Ceridian, is attached hereto as Exhibit "F" ("Sergio Dep. Tr."), 16:15-16.  A Consultant is required to use Ceridian's Case Management System to enter identifying and demographic information about the caller, navigate numerous issue-specific templates to ask questions of the caller, type information in about the specific "user situation" (i.e. the caller's specific issues), and then "summarize everything that [the Consultant] talked about with the

caller."  The deposition transcript of Pam Coombs ("Ms. Coombs") ("Coombs Dep. Tr."),

formerly Mr. Juarez's Team Leader and currently a Consultant for Ceridian, is attached hereto as

Exhibit "G"; Coombs Dep. Tr. 18-34.

      Specifically, a Consultant must "be able to type [in order] to enter [the] case

information" while on the call with the caller/customer.  Mazzola Dep. Tr. 68:16-17.  The

necessity for the contemporaneous entry of the data by the Consultant during the call was

described as follows:

> [F]rom the time [the Consultant] take[s] a call in and a template comes up
> [on the computer screen], [the Consultant] input[s] data into the template
> and [the computer] guides [the Consultant] through questions.  After that,
> [the Consultant] begins hearing a situation [from the caller] and [the
> Consultant] create[s] what's called case notes in the system and [the
> Consultant] use[s] the system to do [his or her] follow-up calls [and]
> request research information.  While [the Consultant] is talking to the
> caller, [he or she] can look up things.  Like if [the caller is] saying "gee,
> my son or daughter's having bed wetting issues, [the Consultant] may not
> know [about that topic] because [he or she doesn't] have kids.  But while
> [the Consultant is] talking to [the caller], [the Consultant] can be
> manipulating the computer and pulling up tons of tips to say "gee, have
> you tried this and have you done this."  And so [the Consultant is] talking
> and working on the computer.  . . . [I]t's seemless to the caller, at least it
> should be, that [the Consultant's] actually using the computer in many
> cases to do an intake and provide them information.

Mazzola Dep. Tr. 23:20-24:21 (emphasis added).

      Without the case information being entered into the computer, Ceridian has "no

way to follow up with callers" or provide "data to client companies."  Mazzola Dep. Tr. 68:16-

20.  Moreover, if a Consultant did not have basic typing skills, the Consultant would not be able

to meet the quota of processing a minimum number of four and a half (4.5) cases a day. Sergio

Dep. Tr. 64:5-7.

Thus, in selecting Consultants, Ceridian was "aiming" for individuals who were

"typists." Sergio Dep. Tr. 22:17-19. Ms. Sergio, Senior Manager Service Delivery in the

Consultation Area, described the importance of a Consultant being a typist as follows:

> [A Consultant has] a headset on and somebody's talking in [the
> Consultant's] ear, telling [the Consultant] all their issues. To be a typist, a
> typist usually doesn't have to look at the keyboard. That's what we're
> aiming for and I'll tell you why – because the people who aren't typists
> leave. We put training into them and it doesn't work. The job feels
> overwhelming to them. So, if [the Consultant has] to look at the keyboard
> because [he or she is] not a typist, it makes the job so much harder for [the
> Consultant] and we have not seen success in that area because there's so
> much [the Consultant has to] focus on.
>
> . . .
>
> [T]yping is almost like a basic skill, so [the Consultant doesn't] have to
> look at the keyboard so that [the Consultant] can maneuver all of the
> systems that [he or she] has to deal with at the same time. . . . If [the
> Consultant] does not have the basics, we're in trouble. They're not going
> to be able to make the 4.5 [the quota for the minimum number of cases to
> be processed a day by a Consultant].

Sergio Dep. Tr. 22:15 – 23:3; 63:23 – 64:7.

The Consultant position therefore requires that the Consultant have the ability to

not only type, but type proficiently. Mazzola Dep. Tr. 65:12-16. Ceridian regarded the ability to

type proficiently as an "essential function of the Consultant job." Mazzola Dep. Tr. 65:21-24. In

terms of words per minute, the ability to type proficiently was defined by Ceridian as typing

between 35 and 40 words per minute. Mazzola Dep. Tr. 65:17-20. Further, the ability to type at

least 40 words per minute was regarded by Ceridian as being encompassed within the "basic business skills and technical skills" and "excellent computer/technical skills" requirements which were set forth in the position description and job posting. Mazzola Dep. Tr. 66:1-67:12, Exhibits "D" and "E".

        C.     **McCallion Staffing Specialists Placed Temporary Consultants At Ceridian, Including Eduardo Juarez.**

              1.     **Prior to The Placement of Eduardo Juarez At Ceridian, McCallion Knew That The Consultant Position Required Excellent Technical Skills And The Ability To Type At Least 40 Words Per Minute.**

        McCallion has had a business relationship with Ceridian of supplying temporary employees for various positions at Ceridian for approximately ten (10) years. The deposition transcript of Lisa McCallion ("Ms. McCallion"), the Vice President of Operations for McCallion, is attached hereto as Exhibit "H" ("McCallion Dep. Tr."), 9:3-19. McCallion began supplying temporary employees to Ceridian for the Consultant position in or around February 2001. McCallion Dep. Tr. 10:2-11.

        Prior to supplying any temporary Consultants, Ms. McCallion met with Ms. Mazzola, Ceridian's Human Resources Consultant, and "got all the information from her on what the job required, went on a tour [of Ceridian's Call Center], and tried to learn about the position." McCallion Dep. Tr. 10:22-11:1. Ms. McCallion recalled that Ceridian wanted her to understand that the position was a "totally different position than [what] most social workers were used to" because it did not involve "dealing one-on-one with any individuals," but rather, the Consultant "would be sitting in a cubicle with a head phone on a computer all day."

McCallion Dep. Tr. 12:3-11.  Ms. McCallion also recalled specifically being told by Ceridian

that the Consultants "had to have very good computer skills." McCallion Dep. Tr. 12:22-23.

Ms. McCallion further admitted that prior to placing Mr. Juarez at Ceridian,

McCallion knew that "the majority of the work for [the Consultant] job involved case processing

on the computer."  McCallion Dep. Tr. 40:18-22.  Specifically, with regard to "technical skills,"

McCallion was aware that Consultants must be "very proficient on the computer." McCallion

Dep. Tr. 44:1-3.  In addition, McCallion also knew, prior to the placement, that "the environment

tended to be fast paced and technical" and, thus, the Consultant position required "much

attention to detail." McCallion Dep. Tr. 41:18-42:1.  In fact, Ms. McCallion acknowledged that:

"[McCallion] actually had many people quitting the assignment [at Ceridian] because they said it

was too fast paced and they couldn't keep up." McCallion Dep. Tr. 42:1-4.

Ms. McCallion acknowledged that, "at the speed that [Ceridian] wanted,

[Consultants] would need [to be able to type] 40 words a minute." McCallion Dep. Tr. 41:8-10.

Specifically, she admitted that "[a Consultant] would have to [type] around 40 words a minute to

just get the workload done." McCallion Dep. Tr. 42:15-18.

Furthermore, Ms. McCallion admitted that prior to placing Mr. Juarez at Ceridian,

she reviewed the position description for the Consultant position which was posted on Ceridian's

website.  McCallion Dep. Tr. 44:4-45:12, Exhibit "E".  McCallion retrieved and reviewed this

position description so that potential candidates would have more information on the position.

McCallion Dep. Tr. 45:12-16.  Based on the position description, McCallion knew that the

Consultant position required that Consultants have "excellent communication and computer/technical skills." McCallion Dep. Tr. 46:1-12.

Most importantly, Ms. McCallion agreed that "the ability to type at least 40 words per minute [was] necessary for someone to be considered to have excellent computer/technical skills." McCallion Dep. Tr. 46:13-18. Thus, in order to perform the Consultant job in the "fast paced environment," Ms. McCallion acknowledged that it is necessary for the Consultant to type 40 words per minute. McCallion Dep. Tr. 46:19-47:3.

> **2.    Prior To The Placement Of Eduardo Juarez At Ceridian, McCallion Represented To Ceridian That McCallion Would Complete A Thorough Screening And Testing Of All Candidates, Including Testing For Typing Skills.**

Ms. McCallion admitted that one of the duties of McCallion as the temporary agency was to screen candidates for Ceridian in order to identify qualified candidates. McCallion Dep. Tr. 47:5-9. Ceridian was operating under the assumption that McCallion tested temporary candidates, including Mr. Juarez, prior to their placement at Ceridian, including testing candidates on their typing skills. Mazzola Dep. Tr. 39:17-40:5; 41:8-13. Ceridian's assumption that McCallion tested all temporary employees on their typing skills, prior to a placement, was based on representations made by McCallion in various documentation provided to Ceridian by McCallion. Mazzola Dep. Tr. 39:24-40:5.

Specifically, prior to the placement of Mr. Juarez at Ceridian, McCallion provided various documentation to Ceridian regarding McCallion's services, which stated:

- Candidate Assessment.  Each Recruiter evaluates the candidates prior to submission to your company.  This thorough assessment process promotes successful employee retention. This process includes: Skills Evaluation.  A copy of this document, which was attached as Exhibit 8 to Ms. McCallion's deposition, is attached hereto as Exhibit "I", p. 4.

- Client Services. Every Applicant will complete: Skills Assessment. A copy of this document, which was attached as Exhibit 9 to Ms. McCallion's deposition, is attached hereto as Exhibit "J".

- Our customer focused recruitment and hiring services are designed to quickly and cost-effectively find the people you need with the skill sets you require.  Our services include: Skills Assessment and Testing. A copy of this document, which was attached as Exhibit 10 to Ms. McCallion's deposition, is attached hereto as Exhibit "K".

- Matching skills to your needs.  To assure that a temporary associate is qualified for your assignment, we complete a thorough screening and testing process, including . . . tests for  . . . general office skills, and software proficiency. A copy of this document, which was attached as Exhibit 11 to Ms. McCallion's deposition, is attached hereto as Exhibit "L".

- Every candidate who has computer experience will be tested to see the extent of his or her knowledge and abilities. . . .  We also have the complete office skills package that includes:  . . . Typing test. A copy of this document, which was attached as Exhibit 12 to Ms. McCallion's deposition, is attached hereto as Exhibit "M".

McCallion Dep. Tr. 49:13-61:20.

Furthermore, McCallion's sample application for temporary employment, which was distributed to McCallion's clients including Ceridian, included a section for an applicant's test scores to be indicated, including a typing test score, and a section for the applicant to check his or her areas of experience, including typing experience. McCallion Dep. Tr. 62:16-63:15.  A copy of the sample application, which was attached to Ms. McCallion's deposition transcript as Exhibit 13, is attached hereto as Exhibit "N".  Clearly, based upon the above representations

-11-

made by McCallion, Ceridian's assumption that McCallion was screening and/or testing

applicants with regard to their skills, and specifically their typing skills, was reasonable.

> **3.      McCallion Did Not Properly Screen Or Test Eduardo
>           Juarez With Regard to His Typing Abilities Prior His
>           Placement At Ceridian.**

Despite the representations made by McCallion to Ceridian regarding the

thorough and complete screening it conducted of its candidates, Ms. McCallion admitted that

prior to placing Mr. Juarez at Ceridian, McCallion did not perform any kind of skills evaluation

or skills assessment with regard to Mr. Juarez's skills.  McCallion Dep. Tr. 51:19-22; 55:1-19.

In fact, no screening or testing of Mr. Juarez's skills was done by McCallion prior to placing him

at Ceridian. McCallion Dep. Tr. 57:18-21; 59:5-9.

Specifically McCallion did not administer a typing test to Mr. Juarez prior to his

placement at Ceridian, despite the fact that Mr. Juarez failed to indicate on the McCallion

application that he had any typing experience, and McCallion knew that it was necessary for a

Consultant to type 40 words per minute to perform the consultant job.  McCallion Dep. Tr.

21:24-22:4; 46:19-47:3; 64:12-65:21; a copy of the Mr. Juarez's McCallion application, which is

attached to Ms. McCallion's deposition transcript as Exhibit 14, is attached hereto as

Exhibit "O".  In addition to the fact that Mr. Juarez was not tested on his typing abilities, he

admitted that he did not discuss anything with McCallion with regard to his typing abilities.  The

deposition transcript of Eduardo Juarez ("Juarez Dep. Tr.") is attached hereto as Exhibit "P,"

Juarez Dep. Tr. 22:4-6; 23:7-15.  McCallion's only explanation for not testing Mr. Juarez with

regard to his typing abilities was simply that McCallion thought that a candidate with a master's

degree would find it offensive or insulting to be tested on typing. McCallion Dep. Tr.  22:15-18; 59:21-60:4.

    **D.**    **Eduardo Juarez Was Placed at Ceridian And His Temporary Placement  Was Discontinued Two Weeks Later.**

        **1.**    **Eduardo Juarez Was Temporarily Placed at Ceridian Through a Referral From McCallion.**

Through the referral from McCallion, Mr. Juarez began work for Ceridian as a temporary employee on or about August 6, 2001.  Juarez Dep. Tr. 9:3-6.  Mr. Juarez admitted that he was an employee of McCallion and not Ceridian, the company where he was placed. Juarez Dep. Tr. 29:4-11.  A total of six (6) temporary Consultants, including Mr. Juarez, were placed by McCallion at Ceridian at the same time as Mr. Juarez.  Juarez Dep. Tr. 97:24-98:9.

Prior to his placement at Ceridian, Ceridian was aware of the fact that Mr. Juarez used a wheelchair.  Sergio Dep. Tr. 29:8-12.  Ceridian was "enthused" about that and thought that it was "terrific" but "no big deal." Sergio Dep. Tr. 29:16-19; Mazzola Dep. Tr. 47:4-12. Other than knowing that Mr. Juarez used a wheelchair, Ceridian had no other information regarding why Mr. Juarez used a wheelchair. Sergio Dep. Tr. 29:13-16.

        **2.**    **During the First Two Weeks of Training at Ceridian, Concerns Were Raised Regarding The Typing and Computer Proficiency Abilities Of The New Group of Temporary Consultants, Which Included Eduardo Juarez.**

During the two (2) week period that Mr. Juarez was placed at Ceridian, he was involved mainly in "training."  Juarez Dep. Tr. 53:14-16.  Mr.  Juarez admitted, however, that either prior to his placement at Ceridian, or during the two (2) week period he was at Ceridian,

he learned that the Consultant job involved "case processing on the computer" and required "much attention to detail," "basic business and technical skills," and "the ability to multi-task in a fast-paced high change environment."  Juarez Dep. Tr. 40:7-11; 41:5-7; 44:9-11; 44:21-23; 45:14-19.  Further, Mr. Juarez admitted that he does not know how much time would be spent typing in the course of a day as a Consultant because he "never made it to that point" in the training.  Juarez Dep. Tr. 46:14-18.

During the two (2) weeks of training, Ceridian noticed that the group of six (6) temporary Consultants referred by McCallion, which included Mr. Juarez, did not "appear[] to be able to keep up with the speed of and the pace of [Ceridian's] workplace."  Mazzola Dep. Tr. 53:14-18.  It was observed that of the new group of six (6) temporary employees, "none of them were performing much at all."  Coombs Dep. Tr. 63:15-16.  Ms. Coombs, who was the Team Leader for the group to which Mr. Juarez was assigned, noted to Ms. Sergio, that "this particular group [was] having difficulty functioning with typing, with being on the computers…" Coombs Dep. Tr. 63:20-22.  She commented that "none of them were getting it."  Coombs Dep. Tr. 64:1.  Ceridian was "concerned about what [it] was seeing" due to the fact that Consultants are "typing while they are on the phones all day" and Ceridian observed that some in the group "may not have been able to type, may not have been fast [typists] [and/or], may not have had good computer skills."  A copy of the deposition transcript of Eilene Rinsky ("Ms. Rinsky"), a Team Manager for Ceridian, is attached hereto as Exhibit "Q" ("Rinsky Dep. Tr."); Rinsky Dep. Tr. 15:21-16:5.

3.     **When It Was Discovered That McCallion Had Not Evaluated The Typing and Computer Skills of the Temporary Consultants Prior To Their Placement At Ceridian, McCallion Was Advised That It Needed To Properly Assess The Temporary Consultants' Skills And, Thus, McCallion Subsequently Administered A Typing Test and Microsoft Word Proficiency Test.**

Due to the concerns regarding the group of which Mr. Juarez was a member, Ms. Sergio and Ms. Rinsky discussed that Ms. Rinsky should contact McCallion to determine what type of screening McCallion had done of the temporary candidates prior to placing them at Ceridian. Sergio Dep. Tr. 46:12-14. Accordingly, Ms. Rinsky contacted McCallion and questioned McCallion regarding its skills evaluation and assessment process because Ceridian had assumed that McCallion had such a process in place. Sergio Dep. Tr. 46:16-19; Rinsky Dep. Tr.16:5-10. Ms. Rinsky learned from McCallion, however, that McCallion "had not done much in the way of computer and typing skills [assessment]." Rinsky Dep. Tr. 16:10-13. Therefore, Ms. Rinsky advised McCallion that McCallion "needed to do something to assess [the group of temporary Consultant's] level of computer proficiency and typing proficiency." Rinsky Dep. Tr. 17:8-11.

Accordingly, on or about August 16, 2001, McCallion administered tests involving typing and computer proficiency in the software program Microsoft Word at McCallion's offices to the group of six (6) temporary Consultant employees, including Mr. Juarez. McCallion Dep. Tr. 70:18-24. It was determined that a passing score on the typing test was typing at least 40 words per minute and a passing score on the Microsoft Word test was scoring at least a 70%. Mazzola Dep. Tr. 42:10-23; McCallion Dep. Tr. 69:7-70:17.

**4.     Three of the Six Temporary Employees, Including
Eduardo Juarez, Did Not Pass the Typing or Microsoft
Word Proficiency Tests And Their Temporary
Placement At Ceridian Was Discontinued.**

Mr. Juarez was permitted to take the typing test twice.  Juarez Dep. Tr. 74:6-8.

However, Mr. Juarez admitted that he did not pass the typing test.  Juarez  Dep. Tr. 73:12-14;

74:9-15.  In fact, Juarez only typed 21 words per minute.  A copy of the result of Mr. Juarez's

typing test, which was attached to Mr. Juarez's deposition transcript as Exhibit 8 and

Ms. McCallion deposition transcript as part of Exhibit 15, is attached hereto as Exhibit "R,"

Juarez  Dep. Tr. 75:3-13.

Three (3) of the six (6) temporary Consultant employees who were given the

typing test and Microsoft Word test did not pass the tests.  McCallion Dep. Tr. 72:22-73:10.

Specifically, in addition to Mr. Juarez failing the typing test, Linda Hazelwood ("Ms.

Hazelwood") failed the Microsoft Word test and Elizabeth Lancantora ("Ms. Lancantora") failed

the typing test.  Id.  Copies of the results of Ms. Hazelwood's and Ms. Lancantora's typing test

and Microsoft Word test results, which were attached to Ms. McCallion deposition transcript as

part of Exhibit 15, are attached hereto collectively as Exhibit "S," McCallion Dep. Tr. 72:22-

73:6.

On August 17, 2001, Mr. Juarez was advised by McCallion that his temporary

placement at Ceridian was discontinued. McCallion Dep. Tr. 73:17-23.  Mr. Juarez's temporary

placement was discontinued as a result of his failure to pass the typing test.  Answer, ¶ 20.

Similarly, on August 17, 2001, Ms. Hazelwood, who failed the Microsoft Word test, and Ms.

-16-

Lancantora, who failed the typing test, were also advised by McCallion that their temporary

placement at Ceridian was discontinued. McCallion Dep. Tr. 73:17-23.

### E.    Mr. Juarez Never Informed Ceridian of His Alleged Disability And Never Requested Any Accommodation From Ceridian.

Mr. Juarez alleges that he suffers from "Charcot-Marie-Tooth disorder, a

congenital disorder that affects the nerves and muscles throughout the body but is mainly

contained to the arms and legs."  Complaint, ¶ 7.  Although Ceridian was aware that Mr. Juarez

used a wheelchair, Ceridian was never informed that Mr. Juarez was "disabled."  Mazzola Dep.

Tr. 59:15-17.  In fact, Ceridian did not have any information regarding the alleged "disability" of

Mr. Juarez, and did not have any information as to why he used a wheelchair.  Sergio Dep. Tr.

29:8-24.

Mr. Juarez admitted that he never informed anyone at Ceridian that he considered

himself to be physically disabled.  Juarez Dep. Tr. 32:3-8.  Moreover, he never told anyone at

Ceridian anything about his physical condition. Juarez Dep. Tr. 32:9-11.  Specifically, he

admitted that he never told anyone at Ceridian that he "did not have full function of his hands."

Juarez Dep. Tr. 76:11-13.  In addition, Mr. Juarez admitted that he never discussed anything with

McCallion regarding any limitations which he might have because of his physical condition and

he never told anyone at Ceridian of any job related restriction he had. Juarez Dep. Tr. 25:9-11;

32:25-33:3.  In fact, Mr. Juarez contended that he does not have any job-related restrictions

because of his physical condition. Juarez Dep. Tr. 33:5-7.

-17-

Most importantly, Mr. Juarez admitted that he never requested an accommodation from Ceridian.  Juarez Dep. Tr. 58:10-19; 84:9-13.  A copy of the EEOC/ADA Intake Questionnaire completed by Mr. Juarez, in which he responded that he never sought a reasonable accommodation because of his disability, and which was attached as Exhibit 6 to Mr. Juarez's deposition transcript, is attached hereto as Exhibit "T;" see p. 5, Question 10, and Mr. Juarez's response.  Rather, Mr. Juarez admitted that the "closest thing [he] ever got to requesting an accommodation" from Ceridian was when he advised Linda Forbish, an employee not of Ceridian, but of McCallion, that he believed he shouldn't have to take the typing test.  Juarez Dep. Tr. 84:11-13.  Mr. Juarez conceded, however, that after taking the typing test which was administered by McCallion at McCallion's offices, he never had any conversations with anyone at Ceridian about the typing test and he never told anyone at Ceridian anything about his typing abilities.  Juarez Dep. Tr. 25:18-26:5; 76:14-16; 81:3-9.

## III.    ARGUMENT

### A.    Summary Judgment Standard of Review.

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Co. v. Catrett, 477 U.S. 317, 322 (1986); Spangle v. Valley Forge Sewer Auth., 839 F.2d 171, 173 (3d Cir. 1988).  "The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact."  Grabski v. Aetna, 43 F.Supp.2d 521, 526 (E.D. Pa. 1999)(citing Celotex, 477 U.S. at 322-23).  In

responding to a motion for summary judgment, the non-moving party then must "go beyond the pleadings, and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

The mere existence of some alleged factual dispute between the parties is an insufficient basis on which to deny a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" only if it will affect the outcome of a lawsuit, and a dispute over a material fact is "genuine" only if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. Id. Finally, a plaintiff may not rely on the allegations of his complaint or on his own speculation as to what evidence he might produce at trial to meet his burden under Rule 56. Id.

**B.      Summary Judgment Must be Granted in Favor of Ceridian Because Eduardo Juarez Is Not A "Qualified Individual" With A Disability Because He Could Not Perform the Essential Job Function of Typing 40 Words Per Minute.**

Mr. Juarez claims that Ceridian discriminated against him in violation of both the ADA and PHRA by allegedly terminating his temporary placement at Ceridian as a Consultant

-19-

and/or failing to hire him for a Consultant position at Ceridian on the basis of his disability.[1] Such a claim fails as a matter of law, however, because Mr. Juarez is unable to make out a prima facie case of discrimination pursuant to the ADA because he was not a "qualified individual" because he could not perform the essential functions of the job.

The ADA prohibits employers from discriminating based upon the known mental or physical impairments of an employee.  42 U.S.C. §12112. In order to establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must demonstrate that he or she (1) is a disabled person within the meaning of the ADA, (2) is a "qualified individual," and (3) has suffered an otherwise adverse employment decision as a result of discrimination. Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001); Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998); Landmesser v. United Air Lines, Inc., 102 F. Supp. 2d. 273 (E.D. Pa. 2000).

Under the ADA a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  To satisfy this requirement, a plaintiff must first demonstrate that he "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." Skerski, 257

---

[1]     "Pennsylvania Courts generally interpret the PHRA in accord with its federal counterparts, which include the ADA."  Sharkey v. Federal Express Corp., No. CIV.A. 98-CV-3351, 2000 WL 230330, *3 (E.D. Pa. Feb. 29, 2000)(citing Salley v. Circuit City Stores, Inc., 160 F.3d 977, 979, n.1 (3d Cir. 1996)).  Accordingly, Mr. Juarez's ADA and PHRA claims are analyzed in this Motion as one under the ADA rubric.

F.3d at 278.  Second, a plaintiff must establish that he, "with or without reasonable

accommodation, can perform the essential functions of the position sought or held."  Id.

With regard to the second inquiry, the Court must determine whether a plaintiff

can perform the essential functions of the job without accommodation.  Id.  If that is the case, the

plaintiff will be considered a "qualified individual," thereby satisfying the second part of the

prima facie case under the ADA. Id.  If the plaintiff cannot perform the essential functions of the

job without accommodation, the Court must then inquire whether he can perform those same

functions with an accommodation.  Again, if he can do so, he will be considered a "qualified

individual" under the ADA. Id.

Under this standard, Mr. Juarez's claim must fail because he cannot establish that

he is a "qualified individual" with a disability because he a cannot demonstrate that he possessed

the requisite typing skill requirement of the Consultant position and he could not perform one the

essential functions of the Consultant position, specifically typing proficiently (i.e. typing 40

words per minute).[2]

A job's "essential functions" are defined as "the fundamental job duties of the

employment position," not its mere "marginal functions."  29 C.F.R. §1630.2(n).  Evidence of

whether a particular function is considered essential includes, among other things: (1) the

employer's judgment; (2) the written job descriptions; (3) the amount of time spent on that

---

2    For purposes of this Motion, Ceridian does not contest that Mr. Juarez can demonstrate
     that he is physically "disabled" within the meaning of the ADA.

function; (4) the consequences of not requiring an employee to perform that function; and (5) the work experience of former and current employees. 29 C.F.R. §1630.2(n)(3). The determination of whether a function is essential to a job is a factual one that should be made on a case by case basis based upon all relevant evidence. <u>Blackwell v. City of Philadelphia</u>, Civ.A. No. 99-0015, 2000 WL 572606, *3 (E.D. Pa. May 10, 2000) (citing 29 C.F.R. §11630.2(n) app.).

Here, no genuine issue of material facts exists as to whether typing proficiently is an essential function of the Consultant job. First, in Ceridian's own judgment, as well as the judgment of McCallion which hired Mr. Juarez and placed him in Consultant position, typing proficiently is an essential function of the Consultant job. In Ceridian's judgment, the Consultant position requires that the Consultant have the ability to type proficiently, which is defined as typing between 35 and 40 words per minute. Mazzola Dep. Tr. 65:12-20. Clearly, Ceridian regarded the ability to type proficiently as an "essential function of the Consultant job." Mazzola Dep. Tr. 65:21-24. Further, McCallion acknowledged that, "at the speed that [Ceridian] wanted, [Consultants] would need [to be able to type] 40 words a minute." McCallion Dep. Tr. 41:8-10. Specifically, McCallion admitted that "[a Consultant] would have to [type] around 40 words a minute to just get the workload done." McCallion Dep. Tr. 42:15-18. Thus, in both the judgment of Ceridian and McCallion, the ability to type at least 40 words per minute is regarded as a function which is essential to the Consultant job.

Second, the written job description and job posting further demonstrate that typing proficiently is an essential function of the Consultant job. The job description set forth by Ceridian for the Consultant position described the "Knowledge, Skills, and Abilities" needed to

perform the Consultant job as including: "[b]asic . . . business skills, and technical skills" and the "[a]bility to multi-task and work in a fast paced, high change environment." Exhibit "D". A job posting for the Consultant job which was created by Ceridian and posted on Ceridian's web-site in 2001 described the qualifications for the position as including: "Excellent communication and computer/technical skills;" and the "Ability to multi-task and work in fast-paced, high change environment." Exhibit "E". Specifically, the ability to type at least 40 words per minute was regarded by Ceridian as being encompassed within the "basic business skills and technical skills" and "excellent computer/technical skills" requirements which were set forth in the position description and job posting. Mazzola Dep. Tr. 66:1-67:12. In addition, McCallion, which hired Mr. Juarez for the Consultant position, acknowledged that it knew from reviewing the job posting that the Consultant position required that Consultants have "excellent communication and computer/technical skills" and it considered "the ability to type at least 40 words per minute necessary for someone to be considered to have excellent computer/technical skills." McCallion Dep. Tr. 46:1-18. Further, McCallion admitted that in order to perform the Consultant job in a "fast paced environment," it is necessary for a Consultant to type 40 words per minute. McCallion Dep. Tr. 46:19-47:3. Even Mr. Juarez himself admitted that either prior to his placement at Ceridian, or during the two week period he was at Ceridian, he learned that the Consultant job involved "case processing on the computer" and required "much attention to detail," "basic business and technical skills," and "the ability to multi-task in a fast-paced high change environment." Juarez Dep. Tr. 40:7-11; 41:5-7; 44:9-11; 45:14-19.

Third, the amount of time spent by a Consultant on the typing function is significant. One of the job descriptions specified that: "<u>The majority of the work involves</u> services delivery via the telephone with <u>case processing on the computer</u>." Exhibit "D" (emphasis added). In fact, because the "whole job is on the computer," the position is described to applicants as "50 percent clinical and 50 percent technical." " Mazzola Dep. Tr. 23:17-18; 36:12-17; Sergio Dep. Tr. 16:15-16. Mr. Juarez admitted that he does not know how much time would be spent typing in the course of a day as a Consultant because he "never made it to that point" in the training. Juarez Dep. Tr. 46:14-18.

Fourth, the consequences of not requiring a Consultant to type at least 40 words per minute are dire. The ability to type proficiently is essential to the job because a Consultant is "required to maneuver a number of systems at one time" and is performing "under the clock because of performance guarantees." Segio Dep. Tr. 21:23-22:1; 63:23-64:4. For example, some client companies have "very rigid performance guarantees" and, thus, the information from the caller needs to be entered quickly by the Consultant so that it can be sent to the research department and then the responsive information/referral can be given back to the caller in a certain amount of time. Sergio Dep. Tr. 19:13-20:12; 21:14-23:4. Further, if a Consultant is not able to type, the Consultant would not be able to meet the quota of processing a minimum number of four and a half (4.5) cases a day. Sergio Dep. Tr. 64:5-7; Mazzola Dep. Tr. 65:12-24. As McCallion also noted, "[a Consultant] would have to [type] around 40 words a minute to just get the workload done." McCallion Dep. Tr. 42:15-18.

Finally, the work experience of former and current Consultants demonstrates that typing at least 40 words per minute is an essential function of the job. Ceridian noted that it aims to hire "typists" for the Consultant position because Consultants who are not typists have historically not been successful in the position:

> To be a typist, a typist usually doesn't have to look at the keyboard. That's what we're aiming for and I'll tell you why – because the people who aren't typists leave. We put training into them and it doesn't work. The job feels overwhelming to them. So, if [the Consultant has] to look at the keyboard because [he or she is] not a typist, it makes the job so much harder for [the Consultant] and we have not seen success in that area because there's so much [the Consultant has to] focus on.

Sergio Dep. Tr. 22:17 – 23:3.

Moreover, although Ceridian does not itself administer a typing test to its direct-hire Consultants, applicants for the Consultant job are extensively questioned regarding their typing ability, including specifically being asked how fast they can type. Coombs Dep. Tr. 10:14-11:1. Accordingly, the experience of past and current employees in the Consultant job is further evidence that typing at least 40 words per minute is an essential function of the Consultant job.

Thus, based upon the fact that: (1) in Ceridian's own judgment, typing 40 words per minute is an essential function of the Consultant job; (2) the written job description and job posting both encompass the ability to type at least 40 words per minute as a requirement for the Consultant position; (3) the amount of time spent by a Consultant on the typing function is significant; (4) the consequences of not requiring a Consultant to type at least 40 words per minute are dire to both the Consultant's performance and Ceridian's business; and (5) the work

-25-

experience of former and current employees in the Consultant job demonstrates that typing at least 40 words per minute is an essential function of the Consultant job; reasonable jurors could <u>only</u> find that typing at least 40 words per minute is an essential function of the Consultant position.

It is undisputed, however, that Mr. Juarez could not type 40 words per minute without an accommodation. Mr. Juarez admitted that he failed the typing test administered by McCallion. Complaint, ¶ 19, Juarez Dep. Tr. 74:14-15. After being given two (2) opportunities to take the test, he was only able to type 21 words per minute, which was almost 50% less than the number of words per minute he needed to type to pass the test. Exhibit "R"; Juarez Dep. Tr. 73:12-14; 74:6-15. Insofar as Mr. Juarez has conceded that he cannot type 40 words per minute, it is undisputed that he cannot perform an essential function of the Consultant job without an accommodation. Accordingly, Mr. Juarez can only demonstrate that he is a "qualified individual," and thereby satisfying the second part of a prima facie case under the ADA, if he can demonstrate that he can perform the essential functions of the Consultant job <u>with</u> an accommodation.

Mr. Juarez, however, was not entitled to an accommodation. As discussed more fully below, Ceridian did not have an obligation to engage in the interactive process of determining an appropriate and feasible accommodation because Mr. Juarez never initiated the process by requesting an accommodation. Accordingly, Mr. Juarez is unable to make out a prima facie case of discrimination pursuant to the ADA because he was not a "qualified individual" within the meaning of the ADA and summary judgment must be granted in favor of

Ceridian.  See Deily v. Waste Management of Allentown, Civ. A. No. 01-2956, 2003 WL 170038 (3d Cir Jan. 24, 2003)(affirming grant of summary judgment on ADA claim in favor of employer because former employee was not "qualified individual" with a disability as contemplated by the ADA);  Peter v. Lincoln Technical Inst., Civ. A. No. 01-CV-5949, 2002 WL 31939087 (E.D. Pa. 2002 Aug. 30, 2002)(granting summary judgment on ADA claim in favor of employer because employee could not make out prima facie case because she was not a "qualified individual" within the meaning of the ADA); Balls v. AT&T Corp, 28 F.Supp.2d 970, 973-974 (E.D. Pa. 1998)(granting summary judgment on ADA claim in favor of employer because employee was not a "qualified individual" with a disability because employee could not prove she could perform essential function of job of typing 45 words per minute); Tomosello v. Delta AirLines, Inc., 8. F. Supp.2d 1090 (N.D. Ill. 1998)(granting summary judgment on ADA claim in favor of employer because employee, who could not perform essential job function of typing, was not a "qualified individual" under the ADA); Dyke v. O'Neal Steel, Inc., 327 F.3d 628 (7th Cir. 2003)(affirming grant of summary judgment on ADA claim in favor of employer because temporary employee, with only one eye, was not a "qualified individual" because he was unable to meet vision requirements, and thus could not perform essential functions of job).

**C.    Summary Judgment Must be Granted in Favor of Ceridian Because Ceridian Did Not Have An Obligation To Engage In The Interactive Process Because Eduardo Juarez Never Requested An Accommodation.**

Mr. Juarez also alleges that Ceridian discriminated against him by failing to afford him a reasonable accommodation.  Complaint, ¶ 28.  Ceridian, however, did not have an

obligation to engage in the interactive process of determining an appropriate and feasible accommodation because Mr. Juarez never initiated the process by requesting an accommodation.

An employer commits unlawful discrimination under the ADA when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business [of the employer]." 42 U.S.C. § 12112(b)(5)(A) (2002). The EEOC's interpretative guidelines provide that "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Taylor v. Phoenixville Sch. Dist., 184 F.2d 296, 331 (3d Cir. 1999) (citing 29 C.F.R. Pt. 1630, App §1630.9 at 359).

To show that an employer failed to participate in the interactive process, an employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Taylor, 184 F.3d at 319-320.

First, in this case, although Ceridian was aware that Mr. Juarez used a wheelchair, Ceridian was never informed that Mr. Juarez was "disabled."  Mazzola Dep. Tr. 59:15-17.  In fact, Ceridian did not have any information regarding the alleged "disability" of Mr. Juarez, and did not have any information as to why he was in a wheelchair.  Sergio Dep. Tr. 29:8-24.  Mr. Juarez admitted that he never informed anyone at Ceridian that he considered himself to be physically disabled.  Juarez Dep. Tr. 32:3-8.  Moreover, he never told anyone at Ceridian anything about his physical condition.  Juarez Dep. Tr. 32:9-11.  Specifically, he admitted that he never told anyone at Ceridian that he "did not have full function of his hands." Juarez Dep. Tr. 76:11-13.  However, even assuming that Ceridian can be deemed to have known that Mr. Juarez was "disabled" because of the fact that he used a wheelchair, it is undisputed that he never requested accommodations or assistance for his disability.

The EEOC's interpretive guidelines provide that "... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. pt. 1630 app. § 1630.9.  To request an accommodation, an employee may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation."  Taylor, 184 F.3d at 312-313.  The request need not be in writing but must make clear that the employee wants assistance for his or her disability.  Id.  Put simply, "the employer must know about both the disability and the request for an accommodation of the disability."  Id;  Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000) (emphasis added).

Employers are not required to "assume employees are disabled and need accommodations."  Taylor, 184 F.3d at 313.  Thus, a disabled employee is not entitled to assume

that knowledge on the part of his employer of a disability necessarily translates into constructive notice of a request for accommodation. Taylor v. Principal Financial Group, 93 F. 3d 155, 164 (5th Cir. 1996). Further, an "employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." Hammon v. DHL Airways, Inc., 165 F.3d 441, 450 (6th Cir. 1999). Likewise, "[e]mployers cannot be expected to anticipate all the problems that a disability may create on the job and spontaneously accommodate them." Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736, n. 4 (5th Cir. 1999). An employee, therefore, cannot "expect the employer to read his mind and know he secretly wanted a particular accommodation." Schmidt v. Safeway, Inc., 864 F. Supp. 991, 997 (D. Or. 1994). As such, the burden in is on the employee to take some performative action in requesting an accommodation because employers cannot assume that every disabled employee necessarily wants or needs accommodations.

Here, Mr. Juarez never requested accommodations or assistance for his disability from Ceridian. In fact, Mr. Juarez admitted that he never requested an accommodation from Ceridian. Juarez Dep. Tr. 58:10-19; Juarez Dep. Tr. 84:9-13. On the EEOC ADA Intake Questionnaire, in response to the Question: "Have you ever sought a reasonable accommodation because of your disability? If yes, describe the circumstances surrounding your request to include: date of request, name of job titles of the person(s) to whom the request was made, the type of accommodation requested, and response(s), if any, to the request," Mr. Juarez responded simply: "No." Exhibit "T", p. 5, Question #10. Rather, Mr. Juarez acknowledged that the "closest thing [he] ever got to requesting an accommodation" from Ceridian was when he

advised an employee not of Ceridian, but of McCallion, that he believed he shouldn't have to take the typing test. Juarez Dep. Tr. 84:11-13.

Simply advising a third party that he believed he should not be required to take the typing test is not sufficient evidence that Mr. Juarez requested accommodations or assistance for his disability from Ceridian. In fact, Mr. Juarez conceded that after taking the typing test which was administered by McCallion, he never had any conversations with anyone at Ceridian about the typing test and he never told anyone at Ceridian anything about his typing abilities. Juarez Dep. Tr. 25:18-26:5; 76:14-16; 81:3-9. Further, Mr. Juarez admitted that he never told anyone at Ceridian of any job related restriction he had, and, in fact, Mr. Juarez contended that he does not even have any job-related restrictions because of his physical condition. Juarez Dep. Tr. 25:9-11; 32:25-33:7.

Ceridian, therefore, was not required to speculate as to the extent of the Mr. Juarez's disability or any need or desire for an accommodation and then spontaneously accommodate him. As noted above, Mr. Juarez cannot have expected Ceridian to read his mind and know he secretly wanted a particular accommodation. Thus, insofar as there is no evidence from which a request for an accommodation could be inferred, Ceridian was under no legal obligation to engage in the interactive process. Jones, 214 F.3d at 408 (affirming grant of summary judgment on ADA claim in favor of employer and holding that where employee "never requested an accommodation or assistance for his disability," the employer "was under no legal obligation to engage in the interactive process" and rejecting the argument that employer had "constructive notice" of employee's desire for an accommodation); Peter v. Lincoln Technical

-31-

Inst., CIV. A. No. 01-CV-5949, 2002 WL 31939087 (E.D. Pa. Aug. 30, 2002)(granting summary

judgment on ADA and PHRA claims in favor of employer and holding that "employer did not

have an obligation to engage in the interactive process of determining an appropriate and feasible

accommodation because [the employee] never initiated the process by requesting an

accommodation"); Jordan v. Storage Tech. Corp., No. CIV. A. 99-CV-329, 2000 WL 1277911,

*3 (E.D. Pa. Sept. 7, 2000)(granting summary judgment on ADA claim in favor of employer,

noting that "the burden is on the employee to initiate the [interactive] process by requesting an

accommodation," and holding that employee "failed to establish a prima facie case under the

ADA" because he "never requested accommodations").  Accordingly, because Mr. Juarez never

initiated the process by requesting an accommodation, Ceridian did not have an obligation to

engage in the interactive process of determining an appropriate and feasible accommodation and

summary judgment must be granted in favor of Ceridian on Mr. Juarez's claim that Ceridian

discriminated against him by failing to afford him a reasonable accommodation.[3]

---

3    Further, despite the fact that Mr. Juarez did not request an accommodation, Ceridian
nevertheless made a good faith effort to assist him in seeking accommodations, if needed
and desired.  Ms. McCallion admitted that Ceridian contacted her and asked McCallion to
let Ceridian know if Mr. Juarez, McCallion's employee, had any "special request(s),"
"special needs," and/or if "there was a special type of software or keyboard that would
assist him with his duties."  McCallion Dep. Tr. 30:14-20.  Ms. McCallion relayed this
message to Mr. Juarez but never got any response.  McCallion Dep. Tr. 30: 22-24.
Morrone v. UGI Utilities, Inc., 2000 US. Dist. LEXIS 567, *12 (E.D.Pa. Jan. 27,
2000)(finding that employee who failed to respond to employer's attempts to explore
possible accommodations was precluded from claiming that the employer violated ADA
by failing to provide reasonable accommodation).

## IV.    <u>CONCLUSION</u>

As the foregoing discussion demonstrates, summary judgment is appropriate in favor of Ceridian in this case.  Accordingly, Ceridian respectfully requests that judgment be entered in its favor on all claims and that the case be dismissed in its entirety and with prejudice.

Respectfully submitted,

Carolyn P. Short
Identification No. 38199
Sara A. Begley
Identification No. 49120
Erin M. O'Neill
Identification No. 82372
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Attorneys for Defendant,
Ceridian Corporation, identified in the
Complaint as Ceridian Corporation and Ceridian
Lifework Services

Dated: June 25, 2003

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies she served a copy of Defendant

Ceridian's Motion for summary Judgment and Memorandum of Law in Support Thereof upon

the following counsel of record via hand delivery, this 25th day of June, 2003:

        Alfred J. Falcione, Esquire
        Grady & Falcione, LLP
        225 S. 15th Street, Suite 200
        Philadelphia, PA  19102

_____

Erin M. O'Neill